## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **JOHN BURNS**, | |
| *Plaintiff,* | **Case No. 2:24-cv-01822-JDW** |
| v. | |
| **CITY OF PHILADELPHIA,** | |
| *Defendant.* | |

### MEMORANDUM

What's legal isn't always the same as what's fair. An employer can treat an employee in ways that many people would consider unfair as long as the employer doesn't violate antidiscrimination laws. In this case, the City of Philadelphia terminated John Burns after he took an 18-month leave of absence without proper authorization. If that were the whole story, this would be an easy case. But accepting Mr. Burns's version of events as true, some of his superiors told him it was "fine" that he remained out on an extended, unpaid leave. Understandably, that created some confusion when he tried to return to work. While Mr. Burns has reason to feel misled, he does not have evidence to show that the City's reason for refusing to return him to restricted duty after his unapproved leave, or for terminating him, was a pretext to hide discrimination or retaliation. The City is entitled to summary judgment on each of Mr. Burns's claims.

# I.     BACKGROUND

## A.     Factual History

### 1.     Mr. Burns's restricted duty

Mr. Burns joined the Philadelphia Police Department in September 2007. The Department maintains directives designed to serve as a standard of conduct for all personnel. Among other things, the directives include the Department's rules, policies, and procedures relating to reporting on-duty injuries, use of leave time, and employee timekeeping. They carry the same weight as an order from the Police Commissioner. Every employee receives a copy of the directives at the start of his employment, and the directives are available to all employees electronically. During his employment, Mr. Burns was aware of the Department's directives, had access to them, and knew that all police officers must review and understand them.

Pennsylvania law governs how the Department deals with an officer when the officer is injured on the job. For non-work-related injuries or conditions, the Department has developed a practice of providing police officers who are temporarily disabled with "restricted duty" assignments. Pursuant to this practice, the Department attempts to find light-duty or modified-duty work suitable to the employee's physical capabilities instead of placing these employees in an unpaid, non-work status. An officer assigned to restricted duty must report to a particular police district or unit. While an officer is assigned to restricted duty, the commanding officer of the assigned police district or

2

unit, who might differ from his permanent district or unit, serves as his commanding officer. Officers must request restricted duty, and only the Police Commissioner or the Department's Safety Office may approve restricted duty assignments. Absent approval from the Police Commissioner, restricted duty assignments are not to exceed six months.

Over the course of Mr. Burns's employment, the Department approved him for restricted duty at various times due to non-work-related injuries or conditions. Mr. Burns worked on restricted duty status in 2008, 2013, 2015, and 2016-2017. In January 2021, Mr. Burns requested restricted duty due to a back injury. At the time of his request, Mr. Burns's permanent assignment was with the 35th Police District. The Department approved his request and detailed him to work at the Court Liaison Unit on restricted duty status for up to six months. On April 27, 2021, Mr. Burns claimed that he suffered a workplace injury in the Court Liaison Unit when a fellow police officer struck him in the back, aggravating his pre-existing injury. Three days later, Mr. Burns stopped reporting to work at the Court Liaison Unit and started using his paid sick leave. "Shortly after" this incident, Mr. Burns went back to the 35th District (his permanent duty station) and asked if he could "continue to use [his] sick leave" for his injury. (ECF No. 19-4 at 29:3-18.) Corporal Jennifer Bryan-Ferguson and other unidentified staff told Mr. Burns: "[J]ust keep us posted. That's fine. We'll keep you on sick leave." (*Id.* at 29:8-9.)

On May 11, 2021, Mr. Burns notified the Department about his injury and sought work-related benefits. On May 25, 2021, a representative from the Department's Human

Resources sent a letter to Mr. Burns, advising him that the Department was denying his request for benefits because it determined that his injury was not work-related. The letter also advised Mr. Burns that his "absence from duty will be charged against your accrued personal leave [and that i]n the event that this leave is exhausted, it will be necessary for you to apply for a Medical Leave of Absence" until he could return to duty. (ECF No. 19-43 at 1.)

The Department's directives instruct officers how to request an unpaid medical leave of absence and require that officers "do so in accordance with the procedures outlined" in the directive. (ECF No. 19-38 at 11.5.1.B.) The applicable directive provides that employees requesting a leave of absence for medical reasons, whether paid or unpaid, must "prepare a memorandum in triplicate, and upon the approval of the District/Unit Commanding Officer, the memorandum, along with a doctor's report, will be forwarded to Police Human Resources." (*Id.* at 11.5.A, 11.5.5.A.)

Mr. Burns continued to use his accrued leave until it ran out on August 20, 2021. The City stopped paying Mr. Burns after he exhausted his paid leave. At that point, Mr. Burns did not return to work at the 35th District or the Court Liaison Unit. Nor did he submit a memo to request an unpaid medical leave of absence. Instead, he went to the 35th District and spoke with Cpl. Bryan-Ferguson, Lieutenant Bizworade, and "other people" about what was going on. (ECF No. 19-4 at 31:1-2.) He asked them if he was still on medical sick leave, and they confirmed that he was and told him to keep them posted.

At that time, Captain Michael Zimmerman was the commanding officer at the 35th District. In December 2021, Captain Myesha Massey took over as commanding officer of the District. According to Mr. Burns, throughout 2021 and 2022, he was "constantly communicating" with management at the 35th District, including Capt. Massey. (ECF No. 19-4 at 35:18-19.) He saw his doctor "every month" and would bring his doctor's notes to the city medical unit.[1] (*Id.* at 75:23.) He also informed management and asked if he could continue taking medical leave, and "they said it was fine. Just keep them posted." (*Id.* at 76:1-2.) Mr. Burns contends that these conversations took place, in person, with Cpl. Bryan-Ferguson and Capt. Massey. Capt. Massey denies ever having these conversations with Mr. Burns. In fact, she testified that she does not even know who Mr. Burns is. However, Cpl. Bryan-Ferguson testified that she would "guide [Mr. Burns] as to what the policy is, the procedures are with the Police Department as far as with the Safety Office and Personnel to assist him in the direction he needs to go as far as what his options are for leave of absence and returning to work." (ECF No. 19-24 at 11:17-21.) Mr. Burns was under the impression that he could continue to use "medical sick leave" until 2023. (ECF No. 19-4 at 34:11.) He remained unpaid during this time.

---

[1]     Based on the record, it appears that the official name of this unit is the Employee Medical Services Unit or EMS.

## 2.    Mr. Burns's attempted return to work

In January 2023, Mr. Burns attempted to return to work on restricted duty status. First, he went to the 35th District and met with Capt. Massey and Cpl. Bryan-Ferguson. He told them that his doctor said he was able to work on a restricted duty basis and that he intended to go to the city medical unit to get cleared to return to work. Capt. Massey and Cpl. Bryan-Ferguson said that was fine and to keep them posted. On February 15, 2023, Mr. Burns went to the EMS Unit with a note from his doctor, seeking medical clearance for a restricted duty assignment. He wanted a restricted duty assignment because he was not physically able to perform the duties of police officer at the time. EMS signed off on Mr. Burns's request. The next day, an employee in the Police Department's Safety Office approved Mr. Burns for a restricted duty assignment and told him to report to work at the 35th District.

On February 23, 2023, Mr. Burns reported to work at the 35th District. The assignment sheet for that day indicated that Mr. Burns would be working in the Body Worn Camera room. However, after he arrived, the administrative staff at the District realized that Mr. Burns did not have the proper return-to-duty paperwork, and his name was no longer in the Department's Daily Attendance Report ("DAR") system. They alerted the Safety Office.

The head of the Safety Office, Molly O'Neill, investigated the matter and realized that Mr. Burns had not been on the Department's payroll since September 2021. That

same day, she rescinded Mr. Burns's assignment to restricted duty and shared this information with the 35th District. Capt. Massey and Cpl. Bryan-Ferguson told Mr. Burns that none of his information or certifications were in the DAR system and that he would have to leave. Then, Mr. Burns came back to the 35th District, and Cpl. Bryan-Ferguson helped him draft a memo to HR to try to resolve the issue so that he could return to work.

On March 3, 2013, Mr. Burns submitted a memo to the Police Commissioner at the time, Danielle Outlaw, seeking retroactive approval for a leave of absence from September 5, 2021, through February 16, 2023.[2] That same day, he submitted a separate memo to Commissioner Outlaw, seeking permission to return to work on restricted duty upon returning from his yet-to-be-approved medical leave. Mr. Burns then reached out to Cpl. Bryan-Ferguson regarding the status of his requests, but she did not have any updates to provide him. She suggested that he reach out to the Safety Office or Heather McCaffrey, who was the Director of HR.

On April 27, 2023, Capt. Massey issued a memo, recommending that the City terminate Mr. Burns. Her memo reported that "[f]rom September 5, 2021 to February 16, 2023, P/O Burns remained on an unapproved leave of absence. He failed to notify his supervisors regarding his leave status and did not request a leave of absence prior to

---

[2]    The memo was addressed to the Commanding Officer of the 35th District, which would have been Capt. Massey at the time.

starting his leave." (ECF No. 19-13 at ¶ 2.) She explained that the Safety Office overturned the decision to approve Mr. Burns's return to work on restricted duty status because he "was never approved for a leave of absence." (*Id.* at ¶ 3.) She recommended that he be terminated "for failing to comply with Directive 11.5 Leave of Absence and Separation and Civil Service Regulation 22.02." (*Id.* at ¶ 1.)

While this memo made its way up the chain of command, Mr. Burns was still trying to get clarity about if and when he could return to work. He made several phone calls to Ms. McCaffrey in HR and left voicemails for her, but she never called him back. He also sent her emails, but she did not respond. At some point in May 2023, after receiving no response from Ms. McCaffrey, Mr. Burns sent a memo to Deputy Commissioner John Stanford via email, asking for assistance to figure out his job status.[3] Deputy Commissioner Stanford never responded.

On June 21, 2023, the Deputy Commissioner approved Capt. Massey's recommendation to terminate Mr. Burns. Two days later, Commissioner Outlaw approved the same recommendation and terminated him. On July 3, 2023, Ms. McCaffrey sent a letter to Mr. Burns, advising him that the City terminated him on June 23, 2023. Her letter advised Mr. Burns that he would be separated from the Department under the designation of "Terminated — Abandoned Position," in accordance with Civil Service

---

[3]    It is not clear whether this memo is part of the record. There is an undated memo from Mr. Burns addressed to the "Police Commissioner," requesting a three-month extension of restricted duty status beyond August 16, 2023.

Regulations. (ECF No. 19-12.) After receiving this letter, Mr. Burns went to the HR office and spoke with Ms. McCaffrey in person in an attempt to get his job back. Ms. McCaffrey claimed that she was not familiar with his situation but that she would look into it. Once he left, she asked a colleague to let her know what was happening, and the colleague advised her that HR was "requesting his termination for failure to return from a leave." (ECF No. 25 at 11-13.) Ms. McCaffrey had no further contact with Mr. Burns.

### B.    Procedural History

On April 30, 2024, Mr. Burns filed this lawsuit against the City, asserting that in revoking his restricted duty status on February 23, 2023, and terminating him on June 23, 2023, the City discriminated against him based on his disability and retaliated against him because he sought accommodations. He also alleges that the City is liable for failing to accommodate him. As a result, he brought claims against the City for violations of the Americans with Disabilities Act, the Pennsylvania Human Relations Act, and the Philadelphia Fair Practices Ordinance. The City has moved for summary judgment on all of Mr. Burns's claims, and that motion is ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw

reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

In opposing summary judgment, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings" and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quotation omitted). "[I]nstead, he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). If he fails to make this showing, then the Court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

## III.    ANALYSIS

### A.    Failure To Accommodate

Although Mr. Burns claims otherwise, there is no question that the City moved for summary judgment on his failure to accommodate claim. The City made its arguments as to that claim in the same section of its opening brief in which it argued that Mr. Burns is not a qualified individual under the ADA. (*See* ECF No. 19 at 6-9.) Admittedly, the City could have avoided confusion by separating its failure to accommodate arguments from its disparate treatment discussion with a separate heading, but no rule required it to do so. And to consider the issue waived for this reason would elevate form over substance,

especially when Mr. Burns had a full opportunity to respond to each of the City's arguments. Thus, I will evaluate whether the City is entitled to summary judgment on the failure to accommodate claims.

A plaintiff asserting a failure-to-accommodate claim under the ADA, PHRA, or PFPO[4] must establish: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quotation omitted). There is no dispute as to the first three elements. However, Mr. Burns cannot prevail on his failure to accommodate claim because he cannot establish that the City could have reasonably accommodated him.

Initially, "the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits." *Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 670 (3d Cir. 1999) (quotation omitted). Mr. Burns has met this burden. There is no dispute that the City has a practice of accommodating uniformed police officers who are temporarily disabled due to a non-work-related injury

---

[4]     The "analysis of an ADA [failure to accommodate] claim applies equally to a PHRA claim." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). Likewise, "[c]ourts typically apply the same framework ... claims to PFPO claims." *Jones v. Children's Hosp. of Philadelphia*, No. 17-cv-5637, 2019 WL 2640060, at *11 (E.D. Pa. June 27, 2019).

by placing them on restricted duty status. In fact, there is evidence in the record that the City permitted Mr. Burns to work on restricted duty status at various times.

Because Mr. Burns has made a *prima facie* showing that an accommodation exists that would have qualified him to return to work as of February 2023, "the burden shifts to the [City] to prove either that the accommodation is unreasonable or that it creates an undue hardship …." *Id.* The City has met that burden.

"The ADA does not mandate that an employer excuse an employee's previous misconduct, even if it was precipitated by his or her disability." *Lassiter v. Children's Hosp. of Philadelphia*, 131 F. Supp.3d 331, 351 (E.D. Pa. 2015) (citation omitted).[5] An employer need not ignore "evidence of an employee's inappropriate or unprofessional conduct which is uncovered during an investigation into" the employee's complaint about other matters. *Bailey v. Com. Nat. Ins. Servs., Inc.*, 474 F. Supp.2d 577, 585 (D. Del. 2007), *aff'd*, 267 F. App'x 167 (3d Cir. 2008). That means a plaintiff cannot prevail on a failure to accommodate claim where the requested accommodation would necessarily require that the employer excuse misconduct, because such a request is inherently unreasonable.[6]

---

[5]    Mr. Burns does not address this argument, even though the City made it in its opening brief.

[6]    *See, e.g., Allen v. Lackawanna Cnty.*, No. 18-cv-209, 2020 WL 13190244, at *10 (M.D. Pa. July 28, 2020), *report and recommendation adopted*, 2022 WL 1110323 (M.D. Pa. Apr. 13, 2022); *Phillips v. Ctr. for Vision Loss*, No. 15-cv-563, 2017 WL 839465, at *14 (M.D. Pa. Mar. 3, 2017); *Willis v. Norristown Area Sch. Dist.*, 2 F. Supp. 3d 597, 607-09 (E.D. Pa. 2014).

There is no genuine dispute that Mr. Burns failed to follow the City's policy for requesting an unpaid medical leave of absence once his paid sick time ran out. The City's Civil Service Regulations provide that "[a]n employee who is absent from the service without a valid leave of absence ... shall be deemed to have abandoned his position and to have resigned from the service ...." Phil. Civ. Serv. Reg. 22.01. The Police Department's directives state the same. (*See* ECF No. 19-38 at Directive 11.6.2.C.) Therefore, absent a valid unpaid leave of absence, Mr. Burns abandoned his position.

To request an unpaid medical leave of absence from the Police Department, officers must "do so in accordance with the procedures outlined" in the applicable Directive. (ECF No. 19-38 at 11.5.1.B.) The applicable Directive, in turn, requires officers seeking a medical leave of absence to "prepare a memorandum in triplicate, and upon the approval of the District/Unit Commanding Officer, the memorandum, along with a doctor's report, will be forwarded to Police Human Resources." (ECF No. 19-38 at 11.5.5.A.) Consistent with these Directives, Human Resources advised Mr. Burns via a letter dated May 25, 2021, that if he exhausted his accrued personal leave while recovering from his back injury, then it would be "necessary" for him to "apply for a Medical Leave of Absence" until he was capable of returning to duty. (ECF No. 19-43.)

Mr. Burns did not request a leave of absence pursuant to the City's policy, even though it's undisputed that he had access to the policies, knew that he had to review and understand them, and knew that they carry the same weight as an order from the

Police Commissioner. He does not offer any evidence that Capt. Massey, Cpl. Bryan-Ferguson, Lt. Bizworade, Capt. Zimmerman, or anyone else had the authority to grant him a medical leave of absence outside the prescribed process. Thus, pursuant to the applicable policies, the City deemed him to have abandoned his position. No reasonable jury could conclude that it would have been reasonable for the City to accommodate Mr. Burns with a restricted duty assignment after that abandonment. So, the City cannot be liable for failing to accommodate him and is entitled to summary judgment on this claim.

### B.    Disparate Treatment Discrimination And Retaliation

Mr. Burns's claims of disparate treatment discrimination and retaliation under the ADA, PHRA, and PFPO are subject to the familiar *McDonnell Douglas* burden-shifting framework. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022); *Fowler v. AT&T, Inc.*, 19 F.4th 292, 298 (3d Cir. 2021).[7] To prevail, Mr. Burns must first establish a *prima facie* case. *See Canada*, 49 F.4th at 346. If he makes that showing, then the burden shifts to the City to articulate a legitimate, non-retaliatory reason for taking the adverse actions against him. *See id.* If the City meets that burden, the burden shifts back to Mr. Burns to establish that the City's "explanation was false, and that

---

[7]    Like the failure to accommodate claims, I analyze the disparate treatment and retaliation claims under the various statutes in the same way. *See also Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 126 (3d Cir. 2018) ("[T]he liability standard for the PHRA and the ADA is the same[.]"); *Coleman v. Caritas*, No. 16-cv-3652, 2017 WL 2423794, at *3 n.1 (E.D. Pa. June 2, 2017) ("Claims arising under the ADA and the PFPO are analyzed under the same legal framework.").

[discrimination or] retaliation was the real reason for the adverse employment action[s]."

*Id.* (quotation omitted).

### 1.    *Prima facie* **case**

#### a.    **Disparate treatment**

To establish a *prima facie* case of disparate treatment discrimination, Mr. Burns must prove: (i) he has a disability within the meaning of the ADA; (ii) he is "otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations ...;" and (iii) he has "suffered an otherwise adverse employment decision as a result of discrimination." *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 220–21 (3d Cir. 2024) (quotation omitted). "The burden of proving the *prima facie* case 'is not intended to be onerous.'" *Hollingsworth v. R. Home Prop. Mgmt., LLC*, 498 F. Supp. 3d 590, 603 (E.D. Pa. 2020) (same). However, Mr. Burns cannot establish a *prima facie* case of disability discrimination because he cannot show that he was qualified to perform the essential functions of his job with a reasonable accommodation.

Mr. Burns cannot establish that he was a "qualified individual" under the ADA for the same reason he cannot prevail on his failure to accommodate claim. A qualified individual is "an individual who, with or without ***reasonable*** accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111 (emphasis added). "The City does not dispute that [Mr. Burns] possessed the requisite skills, experience, and education of a police officer." (ECF

No. 19 at 5.) However, as set forth above, Mr. Burns has shown only that he could perform the job of a police officer with an ***unreasonable*** accommodation—returning to work on restricted duty status after taking an unapproved leave of absence for nearly eighteen months in violation of the City's policies. Because Mr. Burns cannot show that a reasonable accommodation would have permitted him to perform the essential functions of a police officer as of February 2023, he cannot establish a necessary element of his *prima facie* case, and the City is entitled to summary judgment on his disparate treatment claims.

### b.    Retaliation

To make out a *prima facie* case of retaliation, Mr. Burns must prove: (i) he engaged in protected employee activity; (ii) adverse action by the City either after or contemporaneous with the protected activity; and (iii) a causal connection between the protected activity and the adverse action. *See Canada*, 49 F.4th at 346. Again, this standard is not meant to be onerous. *See Hollingsworth*, 498 F. Supp. 3d at 603. In this case, only the causation prong is in dispute.

The causation element of a retaliation claim "is highly context-specific" because it "necessarily involves an inquiry into the motives of an employer." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997). Thus, Mr. Burns "may rely on 'a broad array of evidence' to demonstrate the causal link between" his protected activity—*i.e.*, requesting an accommodation—and the adverse employment actions at issue. *Carvalho-*

*Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (quotation omitted).

For example, he can "meet this burden by proffering evidence of [the City's] inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive[.]'" *Id.* (citations and quotation omitted). "These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id.* (quotation omitted). Mr. Burns has come forward with sufficient evidence to create an inference that his requests for an accommodation in early 2023 caused the City to revoke his restricted duty status and terminate him.

### i.    Revocation of restricted duty status

There is no dispute that Mr. Burns engaged in protected employee activity when he presented himself to the EMS unit on February 15, 2023, seeking medical clearance to return to work on restricted duty status. And the City does not dispute that it took an adverse action against him when it revoked his restricted duty status after an employee in the Safety Office had approved it. The relevant decisionmaker for this adverse action is Ms. O'Neill, who learned about Mr. Burns's request for an accommodation and his unapproved leave of absence at the same time—on February 23, 2023. That same day, she decided to revoke his restricted duty status. Given the same-day nature of Ms. O'Neill's decision, a jury could determine that this timing is unduly suggestive of a retaliatory motive. Just as a jury could conclude that Ms. O'Neill made her decision

because she learned that Mr. Burns had taken an unapproved leave of absence, a jury could also conclude that she revoked Mr. Burns's restricted duty status because she learned that he had engaged in protected activity. Thus, Mr. Burns has come forward with enough evidence to establish a causal link between his protected activity and this adverse action.

### ii.    Termination

Mr. Burns also has evidence to support an inference that his requests for an accommodation in early 2023 caused the various decisionmakers[8] to decide to terminate him. He testified that he went to the 35th District in January 2023 and advised Capt. Massey and Cpl. Bryan-Ferguson that he wanted to return to work on restricted duty status. He also appeared for work at the 35th District on February 23, 2023, before Ms. O'Neill revoked his restricted duty status. On April 27, 2023, Capt. Massey recommended termination. Mr. Burns also has evidence that he submitted a memo to former Commissioner Outlaw on March 3, 2023, requesting that the Department permit him to return to work on restricted duty status, and he testified that he sent a similar memo to Deputy Commissioner Stanford in May 2023. On their own, the temporal proximity of

---

[8]    Based on the record before me, it appears that at least three individual decisionmakers played a role Mr. Burns's termination: Capt. Massey; Deputy Commissioner Stanford; and Commissioner Outlaw. None of the Parties' summary judgment briefing indicated whether Mr. Burns intends to pursue a cat's paw theory of liability. Thus, I have considered whether there is evidence that each individual decisionmaker acted with a retaliatory motive.

these events may not be unusually suggestive of a retaliatory motive because a "gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007)

Mr. Burns, however, has offered additional evidence that the City subjected him to a pattern of antagonism during the first half of 2023, while the termination process was ongoing. There is no dispute that after the City revoked Mr. Burns's restricted duty status on February 23, 2023, Mr. Burns submitted memos requesting accommodations and made numerous inquiries about the status of his requests (and his employment in general), but no one from the Police Department responded to him or provided him with any updates. Primarily, he contacted Ms. McCaffrey, the Department's director of HR, numerous times, but she never responded to his calls or emails. In fact, because he could not get Ms. McCaffrey to return his calls, Mr. Burns went to the HR office to speak with her in person (albeit after his termination). In addition, Deputy Commissioner Stanford never responded to the memo that Mr. Burns sent, "asking him for help" after not receiving any response from Ms. McCaffrey. (ECF No. 19-4 at 66:17.)

Though the City's failure to respond to Mr. Burns's repeated inquiries is different than the more common patterns of antagonism that courts have found sufficient to establish causation,[9] judges within the Third Circuit have determined that an employer's

---

[9]    Typical patterns of antagonism include evidence of: "unusually close supervision or

dismissiveness or refusal to engage with an employee can constitute a pattern of antagonism.[10] For example, Judge Bartle found sufficient evidence of a pattern of antagonism where the plaintiff's supervisors "refused to accept" his documentation "[e]ach time he attempted to inform [them] of his disability[.]" *Easterling v. Cnty. of Delaware*, No. 23-cv-5016, 2024 WL 4980791, at *4 (E.D. Pa. Dec. 3, 2024). When I construe this activity in the light most favorable to Mr. Burns, it creates an inference of a pattern of ignoring Mr. Burns's inquiries and refusing to provide him any updates (good or bad) about his employment status. A reasonable jury could conclude that that pattern of conduct until his termination was antagonistic. Thus, Mr. Burns has evidence to satisfy the causation element of his *prima facie* case of retaliation.

### 2. Legitimate nondiscriminatory reason

There is no dispute that the City has evidence that it determined that Mr. Burns abandoned his position with the Police Department when he failed to return to work after exhausting his accrued paid leave as of August 20, 2021, without having requested

---

aggressive discipline[,]" *Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 313 (W.D. Pa. 2020), "condoned harassment[,]" *Carswell v. Steak 'N Shake, Inc.*, No. 19-cv-1580, 2021 WL 3553522, at *7 (W.D. Pa. July 27, 2021), *report and recommendation adopted*, 2021 WL 3549325 (W.D. Pa. Aug. 11, 2021), and a "constant barrage of written and verbal warnings" for "minor matters." *Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993).

[10]    *See, e.g., Murphy v. Hotwire Commc'ns, LLC*, No. 19-cv-5901, 2020 WL 2128472, at *6 (E.D. Pa. May 5, 2020); *Fabian v. St. Mary's Med. Ctr.*, No. 16-cv-4741, 2017 WL 3494219, at *5 (E.D. Pa. Aug. 11, 2017); *Gardner-Lozada v. Septa*, No. 13-cv-2755, 2014 WL 6633195, at *11 (E.D. Pa. Nov. 24, 2014).

approval to take an unpaid medical leave of absence. Thus, the burden shifts back to Mr. Burns to prove that this reason was pretextual.

### 3. Pretext

To overcome summary judgment, Mr. Burns "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the [City's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [City's] action." *Canada*, 49 F.4th at 347 (quotation omitted). To discredit the City's proffered reason, Mr. Burns "cannot simply show that the [City's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the [City], not whether the [City] is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Instead, he "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [City's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence[.]'" *Id.* (quotation omitted) (original emphasis). In contrast to the *prima facie* case, this is a difficult burden to meet. *See id.* In determining whether Mr. Burns has sufficient evidence to establish pretext, I consider "a broad array of evidence, including antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Canada*, 49 F.4th at 347 (quotations omitted).

As an initial matter, judges "look at the totality of the circumstances to determine whether an employer's proffered nondiscriminatory reason is pretext for a discriminatory motive." *Canada*, 49 F.4th at 347. In this case, that means that I must also consider the undisputed fact that the City permitted Mr. Burns to work on restricted duty status to accommodate various medical issues several times over the course of his employment. Thus, there is a documented—and undisputed—history of the City accommodating Mr. Burns's health issues. It was not until the City realized that Mr. Burns had abandoned his position that the City denied one of his requests to work on restricted duty status.[11] Because I consider the totality of the circumstances when determining whether Mr. Burns can establish pretext, I view his evidence against this backdrop. In this case, Mr. Burns's evidence falls short.

*First*, as set forth above, Mr. Burns cannot prevail on his claim that the City failed to accommodate him, and the same reasoning dooms his pretext argument. In short, Mr. Burns was "not entitled to special treatment or accommodations simply because" he had engaged in protected conduct. *Prise v. Alderwoods Grp., Inc.*, 657 F. Supp.2d 564, 624 (W.D. Pa. 2009). And "[a]n employer's attempts to manage an employee's pre-existing performance deficiencies after the employee has engaged in protected activity do not necessarily raise an inference of retaliatory animus." *Thomas v. Bronco Oilfield Servs.*, 503

---

[11]    On some prior occasions, the City denied Mr. Burns's requests to extend his restricted duty status, but the City granted his initial requests each time he asked to work on a restricted duty basis.

F. Supp. 3d 276, 314 (W.D. Pa. 2020). On February 23, 2023, when the City learned about Mr. Burns's 18-month unapproved leave of absence, it started taking steps to formalize his termination, and the bureaucratic process did not conclude until July 3, 2023. The fact that the City did not engage in an interactive process with Mr. Burns or offer him any accommodations during that time would not lead a reasonable jury to disbelieve the City's reason for terminating him. And given the City's history of accommodating Mr. Burns's various health issues, this evidence also would not permit a reasonable jury to conclude that it was more likely than not that Mr. Burns's disability or his requests for an accommodation caused the City to revoke his restricted duty status and terminate him.

*Second*, the pattern of antagonism on which Mr. Burns relies to help establish his causation prong is not sufficient to establish pretext. In contrast to a *prima facie* case of discrimination or retaliation, the "standard to demonstrate pretext places a difficult burden on the plaintiff[.]" *Fuentes*, 32 F.3d at 765. Certainly, there is no dispute that between February 2023 and Mr. Burns's termination, Ms. McCaffrey ignored Mr. Burns's repeated inquiries for information. While this pattern of antagonism helped establish causation, the lack of response from Ms. McCaffrey "is of limited probative value as far as [the decisionmakers'] motivation is concerned." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). The fact that Deputy Commissioner Stanford did not respond to Mr. Burns's memo also does not help establish pretext. Nothing in the record would permit a jury to infer that Deputy Commissioner Stanford ignored the memo due to a

discriminatory or retaliatory animus.

*Third*, even if some of Capt. Massey's testimony is incredible, that does not necessarily establish that the *City's* reason for terminating Mr. Burns was pretextual. Mr. Burns has evidence that throughout 2022, he had regular conversations with Capt. Massey and Cpl. Bryan-Ferguson about his medical issues, including in-person visits to the 35th District "at least once a month" to update them about the status of his medical condition.[12] (ECF No. 19-4 at 76:10.) According to Mr. Burns, Capt. Massey told him he could continue taking medical leave and to keep them (meaning she and Cpt. Bryan-Ferguson) posted. Certainly, if a jury believes Mr. Burns, then it would have reason to disbelieve Capt. Massey's assertions that (a) she had no idea who he was when he showed up to the 35th District in early 2023; (b) she did not recall having any conversations with him about his medical issues or leave status; and (c) "[h]e failed to notify his supervisors regarding his leave status." (ECF No. 19-13 at ¶ 2.)

But even if Capt. Massey's assertions are untrue, that does not tell a jury anything about her reasons for recommending Mr. Burns's termination. In other words, those falsehoods do not make it more likely than not that Capt. Massey recommended

---

[12]    Mr. Burns provided conflicting testimony on this issue. He also testified that the first time he encountered Capt. Massey in person while she was the commanding officer at the 35th District was when he went there in 2023 and told her that he was trying to return to work on restricted duty. (*See* ECF No. 19-4 at 40:16-42:15.) However, I have given Mr. Burns the benefit of the doubt regarding this conflicting testimony and assumed that Capt. Massey was one of the people he updated over many months beginning in December 2021, when she became the commanding officer at the 35th District.

termination due to a discriminatory or retaliatory motive. To the contrary, if a jury believes Mr. Burns's testimony, then it would have little reason to conclude that Capt. Massey acted out of impermissible animus. According to him, he was "constantly communicating" with Capt. Massey throughout 2022[13] about his need to be out on medical leave, and month after month—for over a year—Capt. Massey *accommodated* Mr. Burns by permitting him to remain on an unpaid medical leave of absence until he was ready to return to work. If that's true, then it makes no sense to conclude that in early 2023, Capt. Massey had a change of heart and developed an animus or hostility against Mr. Burns based upon his disability or because he requested an accommodation.

Likewise, even if Capt. Massey's testimony is not credible, it is not a reason to disbelieve the City's reason for revoking Mr. Burns's restricted duty status and terminating him. Capt. Massey's assurances to Mr. Burns throughout 2022 that it was "fine" that he remained on a medical leave of absence are not inconsistent with the City's conclusion that Mr. Burns had abandoned his position. As set forth above, there is no dispute that Mr. Burns failed to request a medical leave of absence in accordance with the City's policies. But there is no evidence in the record that Capt. Massey was aware of that fact.

When Mr. Burns ran out of paid sick leave in August 2021, the commanding officer

---

[13]    Capt. Massey did not become the commanding officer at the 35th District until December 2021. This fact is not in dispute. (*See* ECF No. 19-2 at 15, ¶ 51; 19, ¶ 64.)

of the 35th District was Capt. Zimmerman, so it would not be reasonable for a jury to infer that Capt. Massey—who did not take over until December 2021—knew that Mr. Burns failed to submit a proper leave request. Thus, when Mr. Burns came to the District each month and asked whether he could *remain* on leave, Capt. Massey had no reason to assume that his leave was unapproved.[14] In fact, she testified that it's not a commanding officer's responsibility to know an officer's status when he is out on medical leave, and Mr. Burns has no evidence to the contrary. Because Mr. Burns does not have evidence that Capt. Massey knew that he had not followed the necessary procedures for seeking an unpaid leave of absence, he has no evidence that the Department failed to follow its directives or otherwise granted him an exception.

That Capt. Massey may have been wrong, mistaken, or unaware of the true nature of Mr. Burns's leave status does not call into question the City's proffered reason for terminating him. There is still no dispute that Mr. Burns did not follow the City's required procedures for obtaining an approved leave of absence, and the evidence in the record reveals that the City remained consistent about the need do so. Thus, even if Capt. Massey or some of her testimony has credibility problems, those issues do not provide a reason to disbelieve the City and cannot establish pretext.

---

[14]    By the same token, Capt. Massey had no reason to correct Mr. Burns's misunderstanding or advise him of the proper procedures for requesting a leave of absence. And, in any event, Mr. Burns was responsible for reviewing and complying with Police Department's Directives.

*Fourth*, the temporal proximity between various decisionmakers' knowledge of Mr. Burns's disability/accommodation request and their decisions to take adverse actions against him does not enable a factfinder to find prejudice. That is true even of Ms. O'Neill's same-day decision to revoke Mr. Burns's restricted duty status. In a case with similar timing,[15] the Third Circuit emphasized that the causation and pretext inquiries are "highly context-specific," such that the factual context could undermine causation even if the temporal proximity might appear unusually suggestive. *See Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017). "Here, in the context of the record as a whole, the chronology of events does not provide substantial support for [Mr. Burns's] position." *Thomas*, 351 F.3d at 114.

The City's policies required Mr. Burns to seek a medical leave of absence once he exhausted his paid sick time. Mr. Burns was responsible for being aware of those policies and complying with them, but HR nevertheless reminded him of this requirement in its letter from May 25, 2021—well before Mr. Burns exhausted his sick leave. Once that happened, Mr. Burns needed to apply for a medical leave of absence according to the City's policies. He never did, so his failure to return to work constituted abandonment.

He argues that the City's version of events is too implausible to believe, but he offers no explanation why a Department consisting of thousands of employees would

---

[15]    In *Carvalho-Grevious*, the plaintiff received a notice that her term as chairperson would end early on the same day she met with HR to discuss a sexual harassment complaint she had lodged against her supervisor. *See Carvalho-Grevious*, 851 F.3d at 260.

chase down a single officer who never came back to work after the City stopped paying him his accrued time. And he offers nothing to rebut Ms. McCaffrey's testimony that given the size of the Department, "stuff falls through the cracks" on occasion. (ECF No. 23-1 at 40:4-5.) That is not implausible—as a general matter—and it is not implausible given Mr. Burns's unique circumstances. When he first started using his sick time in April 2021, Mr. Burns had not been reporting to the 35th District. Instead, he had been detailed to the Court Liaison Unit due to his restricted duty status. Thus, it is not inconceivable that either one, or both, of those units assumed that the other was responsible for reporting on Mr. Burns's status while he was out.

It was only after Mr. Burns received a restricted duty clearance from the EMS unit and appeared for work at the 35th District on February 23, 2023 that Ms. O'Neill realized that he had abandoned his position after his sick time ran out eighteen months prior. Once that information came to light, she revoked his restricted duty status, and HR began the termination process. Given the City's history of accommodating Mr. Burns's prior health issues, the record leaves no meaningful doubt that the City terminated him due to his unapproved absence as opposed to his disability or his request for an accommodation.

That said, not all the fault rests with Mr. Burns. Construing the undisputed facts in a light most favorable to him, Mr. Burns can establish that multiple people in different units across the Police Department were not proactive, shirked responsibility, made

mistakes, gave Mr. Burns incorrect information, and were unprofessional. Understandably, that is frustrating for Mr. Burns, but that doesn't make the City's conduct illegal. And Mr. Burns cannot prevail at trial by showing that the City was wrong, sloppy, or incompetent. Because his evidence would not permit a reasonable jury to disbelieve the City's reason for terminating him or to conclude that it is more likely than not that his disability or protected conduct caused the City to terminate him, he cannot show pretext. Therefore, the City is entitled to summary judgment on his claims of retaliation, and the lack of pretext is fatal to his disparate treatment claims as well.

## IV.   CONCLUSION

Mr. Burns cannot show that the City's reason for revoking his restricted duty status and terminating him was pretextual, dooming both his claims of retaliation and disparate treatment (which also fails at the *prima facie* stage). Because the City could not reasonably accommodate him after he took an extended, unauthorized leave of absence, he cannot prove that the City failed to accommodate him. Mr. Burns might think the City treated him unfairly, but I'm not a member of the Justice League, and I can't rectify every wrong.[16] Because there's no evidence of a violation of any law, I will grant summary judgment in the City's favor on each of his claims. An appropriate Order follows.

---

[16]   *See Faulk v. Owens Corning Roofing and Asphalt, LLC,* No. 3:23-cv-0230, 2025 WL 5317777, at * 9 & n. 90 (N.D. Tex. Feb. 18, 2025) (collecting cases that make the point that a "federal court is not the Justice League. It cannot swoop in and address wrongs, real or perceived, wherever they appear.").

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

July 9, 2025